# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

| | | |
|---|---|---|
| **Robbie Lynn Newby,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:24cv1448 (RDA/IDD)** |
| | ) | |
| **United States,** | ) | |
| **Defendant.** | | |

## MEMORANDUM OPINION

This matter is before the Court on Defendant United States of America's Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). Dkts. 35, 36. Plaintiff Robbie Lynn Newby, a federal inmate proceeding *pro se*, filed his complaint pursuant to the Federal Torts Claim Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.,* alleging that the Federal Bureau of Prisons ("BOP") was negligent because the dental provider at FCI-Petersburg who saw Newby at sick call on June 13, 2023, delayed treatment for his tooth and placed him on a wait list. On January 28, 2026, Newby was advised of his rights pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), Dkt. 38, and he has responded. Dkts. 48, 49, 50, 51, 57. 59. For the reasons stated below, Defendant's motion to dismiss must be granted, and this civil action must be dismissed.[1]

---

[1] Plaintiff filed two motions to strike Defendant's reply brief, Dkt. No. 50, arguing that the reply was not authorized by this Court's Local Rules. Dkt. 53, 55, 56. Plaintiff's argument has no merit. Plaintiff filed a response to the Motion, and the Local Rule provides that "the moving party [the defendant] may file a reply brief within six (6) calendar days after the service of the opposing party's response brief." In addition, Plaintiff seeks leave to file a response to correct factual errors, which will be denied. Plaintiff also seek to have the Court to consider BOP Program Statement 6541.03, which concerns inmate requests for Over-the-Counter Medications. Dkt. No. 61. The Court as reviewed the document. The relevant facts with respect to the Motion are not in dispute and are taken from Plaintiff's Complaint, his Response, and the documents to which he did not object to that were attached to the Motion. *See, infra* at 4-5.

## I. Background

### A. BOP Dental Care Program

By statute, the BOP is directed to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2). To that end, BOP enacted Program Statement 6031.04 ("*PS* 6031.04") (Patient Care), and *Program Statement* 6400.003 ("*PS* 6400.003") (Dental Services).  Dkt. 36-1.[2]  *PS* 6400.003 requires that each institution create an "Institution Supplement" that clarifies the dental program at each institution and its mission.  Institution Supplements are intended to be read in conjunction with the BOP-wide program statement. Consistent with *PS* 6400.003, FCI-Petersburg adopted Institution Supplement PEX-6400.03c ("FCI-Petersburg Supplement").  Dkt. 36-2 at 11-19.  *PS* 6400.003 and the FCI-Petersburg Supplement outline the requirements for dental sick call and specify that dental triage is permitted to allow dental staff to prioritize inmate requests based on urgency. Specifically, the FCI-Petersburg Supplement clarifies that dental sick call is generally conducted every Monday, Tuesday, Thursday, and Friday.  Dkt. 36-2 at 12.[3] At dental sick call, inmates are seen by a dental provider and triaged, in order to determine if the inmate's dental need requires same-day treatment or he can be placed on callout for a future dental appointment. *Id.* at 12.

During a sick call visit, the provider performs a "limited examination," in which "the provider focus[es] only on the patient's chief complaint." *PS* 6400.03(8)(c). A "dentist[] conduct[s] sick call clinics for assessing urgent inmate dental conditions. Provisional dental treatment is provided to manage acutely symptomatic dental disease. Chronic dental disease

---

[2] In 2025, *PS* 6031.05 superseded PS 6031.04. Dkt. 36-2 at ¶ 6 n.1.

[3] *PS* 6031.04 explains the general purpose of triage in the provision of "deliver[ing] medically necessary health care to inmates." *PS* 6031.04(1). "Triage is defined as the classification of patients according to priority of need for examination and/or treatment.  Triage allows truly urgent conditions to be addressed adequately on the same day, while also allowing more routine conditions or concerns to be addressed at a scheduled appointment." *PS* 6031.04(17).

2

management is deferred to the routine dental care program." *PS* 6400.03(10)(c). Sick call requires the inmate to appear in-person for examination and "[d]ental triage" is conducted by staff to "prioritize inmate requests based on urgency when the inmate presents to the sick call clinic." *PS* 6400.03(10)(b). *Id.*[4] The "dentist will perform a clinical exam to determine if the inmate's condition meets sick call criteria of infection, swelling, acute pain, or other conditions that are deemed to be urgent by policy." *Id.* A "limited examination," is a precedent to and "not a substitute for a Treatment Planning Examination." *PS* 6400.003 (8)(d).

> Complete examinations performed by the dentist after the A&O Examination are Treatment Planning Examinations ["TPE"]. [TPEs] enable the practitioner to assess risk, diagnose oral disease, and develop and document a treatment plan. The examination is completed before providing non-urgent treatment and is a thorough and complete visual and tactile examination. It will determine the basis for dental treatment, continued dental maintenance, and frequency of future dental appointments, including continued recall hygiene appointments.

*Id.* 6400.03(8)(c). Routine dental procedures include "[b]asic surgical procedures," which includes but is not limited to "extractions," *PS* 6400.03(9)(c)(4),[5] and "[c]linical dental decisions are the responsibility of the treating dentist(s)." *PS* 6400.03(2)(c).

---

[4] Inmates admitted to FCI-Petersburg are required to attend an admission and orientation session and are furnished with a copy of an admission and orientation handbook. Dkt. 36-2 at 25. The handbook, *id.* at 21-85, provides incoming inmates with general information regarding institution rules, regulations and other programs and serves as a guide for inmates housed at FCI-Petersburg. The handbook discusses dental sick call and specifically notes that dental sick call is announced for inmates to report directly to the health services unit. *Id.* at 45. All sick call requests require the inmate to report in-person to the designated health services area. Outside of individuals housed in the special housing unit, who are separated from other inmates and largely confined to a secure unit, there is no other mechanism by which to request to be seen for sick call. *Id.*

[5] The *PS* 6400.003(11) "defines four priority levels based on acuity that determine the imminence of treatment for inmates. The following categories discuss the priority of dental care, which may change when and by whom dental procedures may be performed." The highest priority is designated "Emergency Dental Care" and includes "conditions that are of an immediate, acute, or grave nature and which, without care, would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life-threatening." *PS* 6400.03(11)(a). Next is "Urgent Dental Care," which includes "[c]are for dental conditions that are not imminently life-threatening," and includes "[s]erious deterioration that may lead to premature death; . . . [s]ignificant reduction in the possibility of repair later without present treatment;". . . [s]ignificant pain or discomfort that impairs the inmate's participation in daily activities." *PS* 6400.03(11)(b). The Program Statement further defines "urgent dental care" to

> Include[] treatment for relief of severe, acute dental pain, traumatic injuries, and acute infections exhibiting the cardinal signs of infection. This includes a palliative treatment intervention that may include placement of sedative, temporary restorations, extraction of non-restorable teeth,

3

*B. Complaint*[6]

Plaintiff notified the "dental department" at FCI-Petersburg of "a bad tooth" on May 20,

2023, via FCI-Petersburg's inmate email system, and was advised two days later that emergency

dental visits were available every Monday, Tuesday, Thursday, and Friday.[7]  Dkt. 1 at ¶ 2; Dkt.

36-2 at 119.[8]  Plaintiff "was told to come to emergency sick call.  When the situation did not

improve and he could tolerate the pain no longer"; he went to dental sick on June 13, 2023, for

---

pulpectomy, and gross debridement of symptomatic areas. Urgent dental care may be requested by inmates on a 24-hour basis. Urgent dental care is the highest priority. Maintaining a wait list for urgent care is prohibited. If dental emergencies occur outside the regular workday, local procedures in the Institution Supplement required by the current Program Statement Patient Care will be followed. The patient must be seen by a dentist within 3 business days of the initial clinical encounter. In the absence of a dentist, the inmate will be seen by a prescribing clinician.

*PS* 6400.003 (10)(a).

[6] Plaintiff raises a hearsay objection to the affidavit attached to Defendant's reply brief.  The only fact that the affiant attests to in the affidavit is that she misinterpreted an acronym in her prior affidavit as to Plaintiff's physical allocation at a previous institution; the affiant corrected that error.  The affiant is a qualified witness under Federal Rule of Evidence 803(6), because she is "'familiar with the business and its mode of operation,' and is able to identify the record and establish that 'it is a record in fact made at or near the time in the regular course of a regularly conducted business activity, made by or from information transmitted by a person within the business with knowledge.'" *Doali-Miller v. SuperValu, Inc.*, 855 F. Supp. 2d 510, 519 (D. Md. 2012): *see United States v. Porter*, 821 F.2d 968, 977 (4th Cir. 1987) (indicating that a "qualified witness" under Rule 803(6) is either the custodian of records or someone who "know[s] the record keeping requirements of the company").

The Fourth Circuit has also held that the term "qualified witness" is to be interpreted broadly[] and requires "only someone who understands the system used to record and maintain the information . . . someone with knowledge of the procedure governing the creation and maintenance of the type of record to be admitted." *United States v. Sofidiya*, 1998 WL 743597, at *3 (4th Cir. 1998) (unpublished) (finding bank employee qualified to lay foundation who was familiar with the procedure used to generate the bank records)

*Rambus, Inc. v. Infineon Techs. AG*, 348 F. Supp. 2d 698, 702-703 (E.D. Va. 2004). The affiant, the Health Services Administrator at FCI-Petersburg, attests that she manages and directs the provision of health services to the inmate population. The affiant is a "qualified witness," the objection is overruled. As noted herein, *see, supra* at note 1; and *infra* at notes 7 and 12, the relevant facts for the current motion are not in dispute and do not include the portion of the exhibit that contains the affidavit to which Plaintiff objects.

[7] Defendant's argument for dismissal for lack of subject-matter jurisdiction relies on the discretionary-function exception to the FTCA's waiver of the Government's sovereign immunity. Newby does not dispute the Defendant's exhibits with the exception of attacking the Defendant's affiant's interpretation of medical record, Dkt. 36-2 at 2-9; Dkt. 59 at 2-6, which he himself admits are irrelevant facts. Dkt. 49 at 3. Defendant has acknowledged the Government's affiant misstated the name of one of the BOP facilities, which Defendant corrected in its reply. Dkt. 50. The relevant facts, however, are not in dispute and together with the Program Statements and the FCI-Petersburg Supplement provide context for discussion of the discretionary-function exception.

[8] May 20, 2023, was a Saturday. The Dental Department is open "Monday through Friday from 0630 to 1500." Dkt. 36-2 at 12.

4

"dental triage," Dkt. 49 at 16, 24 days after he sent his email, Dkt. 1 at 2; Dkt. 36-2 at 104. Plaintiff contributes his delay in reporting to sick call on an institutional lockdown, but there is no mention of a lockdown in his July 20, 2023 email recounting his efforts to obtain treatment for his tooth. Dkt. 49 at 8, 16.

During triage, Newby disclosed that his tooth (#18) had been a problem for "[m]ore than 1 year," which is when the "tooth began to loosen." Dkt. 49 at 3; Dkt. 36-2 at 104. Newby stated on his June 13, 2023 sick call form that his complaint was "Tooth pain need extraction," he reported "Aching/Throbbing," and "indicated [his] pain level was '10.'" Dkt. 49 at 16. This portion of the medical record was not a medical assessment, which is indicated by its inclusion in the "Subjective" portion of the medical record. Dkt. 36-2 at 104. The "Objective" portion of the same medical record indicated that the provider noted Newby's tooth was "Sensitive to Provoking Stimuli," "Tenderness," but no "Swelling in Vestibule." *Id.* After x-rays, the dental provider assessed tooth #18 as "Aggressive periodontitis," recommended extraction, and Newby was told to "watch for callouts." Dkt. 1 at 2; Dkt. 36-2 at 104-05; Dkt. 49 at 16.[9] The medical record indicates that the sick call visit was a "Sick Call Triage" encounter, that the encounter was a "Examination, Limited." Dkt. 36-2 at 104.

Plaintiff admits in his reply that he could have returned to dental sick call after June 13, 2023, but concluded that "[r]eturning to sick call would have been a pointless waste of a $2.00 co-

---

[9] An "Assessment" is a provisional diagnosis. PS 6400.003 (10)(c)(2). The sick call triage began at 10:40 a.m. and was completed at 10:46 a.m. Dkt. 36-2 at 104, 105. Newby submitted BOP Program Statement 6541.03 concerning inmate access to OTC, but he did not explain why the document was relevant to Defendant's Motion. To the extent Newby is attempting to bolster his assertion that his pain level was a "10," the objective portion of the June 13, 2023 Assessment does not support his factual assertion and actually indicates no swelling and does not corroborate Newby's subjective allegations of "Aching/Throbbing." The dentist concluded only that the tooth was sensitive to probing and tenderness. As noted earlier, this point may have some relevance in the context of a Rule 12(b)(6) motion, but the Defendant has moved for dismissal under Rule 12(b)(1).

pay." Dkt. 49 at 12.[10] Plaintiff was placed on dental callout for July 21, 2023, but he did not appear at his appointment. Dkt. 36-2 at 106-07; Dkt. 49 at 7. Newby explains in his response that he was a "no show" on July 21, 2023 for his routine hygiene appointment in the morning and the extraction scheduled for 12:30 p.m. because his tooth fell out the night before. Dkt. 49 at 7. Plaintiff states that he did not report to dental sick call again until August 16, 2023, at which time he reported that the tooth had fallen out on its own and that he had been having issues with another tooth for about two weeks. Dkt. 36-2 at 108. He was instructed to report to dental sick call the next morning. *Id.*[11]

## II. Standard of Review

Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction may attack a complaint on its face (facial challenge), asserting that the complaint fails to allege facts upon which the court can base jurisdiction, or it may attack the truth of any underlying jurisdictional allegations in the complaint (factual challenge). *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). In a factual challenge, such as Defendant's, a district court may "regard the pleadings as mere evidence" and "consider evidence outside the pleadings." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009) (noting that courts may "go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits").[12] "The burden of

---

[10] The FCI-Petersburg Supplement provides that there is no $2.00 co-pay if the sick call is a follow-up. Dkt. 36-2 at 12. Newby does not dispute that he was told to "Follow-up at Sick Call as Needed," *id.* at 105, at the June 13, 2023, sick call examination.

[11] Newby was seen by the dentist for a routine care visit on September 6, 2023. Dkt. 36-2 at 109-14. The medical records note he had a total of 18 teeth missing. *Id.* at 111. During this visit, it was noted all of his remaining teeth were mobile and would require extraction in preparation of fabrication of full dentures (top and bottom). *Id.* at 112. Newby stated that he understood and agreed with the treatment plan. *Id.* Newby's remaining teeth were extracted in accordance with his treatment plan, and he received a full set of dentures on October 18, 2024. *Id.* at 115-19.

[12] The relevant documents outside of the complaint are Dkt. 36-1 at 11-119, Dkt. 36-2, and Dkt. 36-3. *See also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) ("In

6

alleging facts sufficient to establish . . . subject-matter jurisdiction lies, of course, squarely with the plaintiff." *SunTrust Bank v. Village at Fair Oaks Owner, LLC*, 766 F. Supp. 2d 686, 688 (E.D. Va. 2011) (citing *Pinkley, Inc. v. City of Frederick, Md.*, 191 F.3d 394, 399 (4th Cir. 1999)).

### III. Analysis

The FTCA created a "limited waiver" of the Government's sovereign immunity, *Molzof v. United States*, 502 U.S. 301, 305 (1992), by which the federal government may be liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances[.]" 28 U.S.C. § 2674. There are, however, "several exceptions" to this limited waiver. *Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006). The Motion to dismiss is premised upon the discretionary-function exception ("DFE"), under which the Government is not liable for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "The purpose of the exception is 'to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Williams v. United States*, 50 F.3d 299, 309 (4th Cir. 1995) (quoting *United States v. S.A. Empresa di Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)). "[I]t is the plaintiff's burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to his particular claim. *Williams*, 50 F.3d at 304. If the plaintiff fails to meet this burden, then the claim must be dismissed. *Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001)." *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005).

---

determining whether jurisdiction exists, the district court . . . may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.").

The DFE analysis proceeds in two steps. First, a court must determine "whether the challenged conduct . . . is a matter of choice for the acting employee." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "This inquiry is mandated by the language of the exception; *conduct cannot be discretionary unless it involves an element of judgment or choice.*" *Id.* (emphasis added) (citing *Dalehite v. United States*, 346 U.S. 15, 34 (1953) (the exception protects "the discretion of the executive or the administrator to act according to one's judgment of the best course")). Here, Newby "bear[s] the burden of proving that the discretionary function exception does not apply" to his claim. *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009).[13]

Although the DFE does "not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," *Berkovitz*, 486 U.S. at 536, even if the challenged conduct involves an element of judgment, a court

> must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield," *i.e.*, whether the challenged action is 'based on considerations of public policy." [*Berkovitz*, 486 U.S.] at 536-37. This inquiry focuses "not on the agent's subjective intent in exercising the discretion . . . , but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991). Thus, "a reviewing court in the usual case is to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy." *Baum v. United States*, 986 F.2d 716, 720-21 (4th Cir. 1993). Moreover, when a statute, regulation, or agency guideline permits a government agent to exercise discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.

*Suter*, 441 F.3d at 311-12 (4th Cir. 2006).[14]

---

[13] *See Irving v. United States*, 162 F.3d 154, 176 (1st Cir. 1998) ("whether a particular (allegedly negligent) act is exempt from the FTCA under the discretionary function exemption, *Berkovitz* requires us to examine the particular government agent who 'performed [the] given act,' and to determine whether particular conduct is discretionary by looking at the 'range of choice' the agency has delegated to the particular employee in performing the task in question").

[14] Newby's argues that alleging each element of his FTCA claim in his complaint is sufficient to provide this Court with subject-matter jurisdiction. Dkt. 49 at 14. If this were a Rule 12(b)(6) motion, his argument would be relevant. However, it is Newby's burden to also establish that the exemption does not apply. *See supra* at 7-8.

8

To prove the dental provider lacked discretion, Plaintiff had to point to a directive that gave the dental provider *specified* instructions that it [wa]s compelled to follow." *Williams*, 50 F.3d at 309 (emphasis added).  Newby does not address 18 U.S.C. § 4042, cited by Defendant, and instead cited 18 U.S.C.§ 3553(a)(2)(d) in his Complaint, which requires that a *sentencing court* consider whether a sentence will provide a defendant with needed medial care, in the most effective manner. Dkt. 1-4 at 2; 18 U.S.C. § 3553(a)(2)(d).

In *Bulger v. Hurwitz*, 62 F.4th 127 (4th Cir. 2023), a plaintiff alleged individual BOP defendants were negligent when they transferred an inmate to a different institution and placed him in general population where he was killed by other inmates. *Id.* at 134-35.  The Fourth Circuit rejected the plaintiff's argument that § 4042(a)(2)-(3) "'prescribe[d] a course of action' with respect to the challenged conduct," holding that § 4042(a)(2)-(3) required the BOP to "'provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States'" and that § 4042(a)(2)-(3) were "'broad directives'" that afforded the BOP "'discretion regarding the implementation of those mandates.'" *Id.* at 143 (quoting *PS v. United States*, 811 F.3d 140, 145 (4th Cir. 2015)); *see Clemmons v. United States*, No. CV 0:16-1305-DCC-PJG, 2018 WL 6984946, at *6 (D.S.C. Dec. 13, 2018), *report and recommendation adopted*, No. 0:16-CV-1305-DCC, 2019 WL 142274 (D.S.C. Jan. 9, 2019) (*PS* 6031.04 and § 4042(a)(2) provide prison administrators with "discretion regarding the provision of medical care for inmates," and stating that the BOP has "discretion regarding the provision of medical care for inmates" and "no policy, statute, or regulation appears to specifically curtail [the prison administrators'] discretion or dictate[s] any particular action to address [the inmate's] circumstances.") (citing BOP Program Statement 6031.04; 18 U.S.C. § 4042(a)(2); *Williams*, 50 F.3d at 309; *Gaubert*, 499 U.S. at 322; *Berkovitz*, 486 U.S. at 536).  The conduct at issue involved

9

"assessing Bulger's medical condition, transferring him . . . , and placing him within general population." *Id.* at 143.

As in *Bulger,* the conduct at issue here is Newby's dental condition when he presented at sick call on June 13, 2023 and the dental provider assessed whether Newby was an "urgent,"[15] or if his dental issue could be treated "on callout for a future appointment," Dkt. 36-2 at 12.  Here, *PS* 6400.003 and the FCI-Petersburg Supplement set up a sick call system to triage requests for dental services.  At sick call, however, the dental provider chooses how to proceed at sick call based upon the provider's examination of the inmate.  The dental triage portions of *PS* 6400.003 and the FCI-Petersburg Supplement reflect "'discretion regarding the implementation of'" the mandates to provide medical care for federal inmates.  For example, the FCI-Petersburg Supplement provides that at dental sick call, "[i]nmates are triaged, treated, given a pass to return that same day or placed on callout for a future appointment," Dkt. 36-2 at 12,[16] reflecting the necessary discretion necessary in the triage of dental complaints by inmates.   Thus, the DFE applies here.

---

[15] If a condition qualifies as "urgent," *see supra* note 5,

> [m]aintaining a wait list for urgent care is *prohibited.* If dental emergencies occur outside the regular workday, local procedures in the Institution Supplement required by the current Program Statement Patient Care will be followed. The patient *must be seen* by a dentist within 3 business days of the initial clinical encounter. In the absence of a dentist, the inmate will be seen by a prescribing clinician.

*PS* 6400.003(10)(a) (emphasis added). Emergency dental care is given greater priority under *PS* 6400.003(10)(a) and is defined as a matter of exigency—"an immediate, acute, or grave nature and which, without care, would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life-threatening." *Id.*

[16] In the Eighth Amendment context, the Fourth Circuit has noted that

> *[m]edical care is often not immediate. Only the most fortunate are able to receive a doctor's appointment at the precise time they want it or medical attention at the very moment of arrival at a hospital.* Waiting is often the name of the game. And actual treatment may not follow immediately upon medical attention, whether due to the caution of a prudent physician or the inevitable uncertainties of diagnosis. It would be wrong to turn the everyday inconveniences and frictions associated with seeking medical care into constitutional violations whenever they occur within the prison walls.

*Moskos v. Hardee*, 24 F.4th 289, 297-98 (4th Cir. 2022) (emphasis added).

The application of the DFE here is also consistent with other decisions by the Fourth Circuit, which affirmed the application of the DFE where different agencies had "to allocate limited resources among competing needs." *Baum v. United States*, 986 F.2d 716, 722 (4th Cir. 1993). *Baum* involved a vehicle accident where the vehicle went through a guardrail. The claim alleged that the National Park Service was negligent in the design, construction, and maintenance of the guardrail. In *Baum*, the Fourth Circuit held that there was "no mandatory law governing the design and construction of the parkway guardrails" and turned "to the second element of the *Berkovitz-Gaubert* analysis." *Id.* *Baum's* relevance here is its observation that "the choice of materials to be used in the guardrails" was "a choice of the type that normally involves considerations of public policy," and "what materials to use . . . describe[s] [] a question of how to allocate limited resources among competing needs." *Id.* The Fourth Circuit concluded

> [t]he decision of how and when to replace a major element of a substantial public facility is, like the decisions involving design and construction, at bottom a question of how best to allocate resources. Such a decision is inherently bound up in considerations of economic and political policy[] and accordingly is precisely the type of governmental decision that Congress intended to insulate from judicial second guessing through tort actions for damages.

*Id.* at 724; *see also Magno v. Corros*, 630 F.2d 224, 229 (4th Cir. 1980) (explaining that "it is usually inappropriate for a federal court to . . . in effect direct the Coast Guard how to spend its limited resources" and that "[e]very dollar of [Coast Guard] money that we direct it spend is diverted from another regulatory activity").[17] So too here, the decision of how to triage Newby

---

[17] *See, e.g., Blanco Ayala v. United States*, 982 F.3d 209, 217-18 (4th Cir. 2020) (holding that, in conducting arrests, Department of Homeland Security officers consider how they allocate limited agency resources such as "time, legal resources, and detention capacity"); *Nanouk v. United States*, 974 F.3d 941, 948 (9th Cir. 2020) (finding military's "triage system for addressing a large number of simultaneous demands on finite resources," involving clean up of environmental hazard waste, was "a policy judgment that necessarily involved the weighing of competing social, economic, and political considerations. As part of this complex calculus, the military had to decide which individuals or communities would be left at risk of environmental harm that could have been avoided in order to avert greater harm elsewhere. That is the kind of policy judgment protected by the discretionary function exception."); *Williams v. United States*, 314 F. App'x 253, 255, 258 (11th Cir. 2009) (holding FBI officer's decision to hit fleeing arrestee with

and what next steps were required with respect to his dental condition is bound up in considerations of resources, timing, and policy which demonstrate their discretionary nature.

The Fourth Circuit addressed a similar issue with respect to Mine Safety and Health Administration ("MSHA") inspectors who were alleged to have been negligent because the inspectors failed to discover safety violations in a mine. *See Est. of Bernaldes v. United States*, 81 F.3d 428, 429 (4th Cir. 1996). Although "the MSHA regulations contain[ed] some mandatory language, mining inspectors ha[d] discretion under the regulations to determine if a given mine [was] in compliance with the regulations." *Id.*[18] In affirming the district court, the Fourth Circuit relied on *Gaubert* holding "that if a government employee has discretion under the first *Gaubert* prong, it 'must be presumed' that his acts 'are grounded in policy when exercising that discretion." *Id.* (citing *Gaubert*, 499 U.S. at 324). The burden is on the plaintiff to establish "that the discretionary function exception does not foreclose [his] claim." *Ayala v. United States*, 982 F.3d 209, 214 (4th Cir. 2020) (quoting *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 857 (4th Cir. 2016)). Again, applying this standard here, Newby has not met this burden.

In the context of a *Bivens'* claim,[19] involving a decision to transfer an inmate to another facility where the inmate's medical condition was a factor in the decision, the Fourth Circuit

---

car was grounded in considerations of "the need to restrain [the arrestee], the concern for [the arrestee's] safety, the public's safety, [the officer's] available resources, and the information at hand").

[18] The Program Statements also contain mandatory language that require the dental provider to take certain actions. For example, PS 6400.03(10)(a) prohibits a facility from "[m]aintaining a wait list for urgent care," which "includes treatment for relief of severe, acute dental pain, traumatic injuries, and acute infections exhibiting the cardinal signs of infection," *id.,* and include emergency situations as those where the condition is acute or grave "which, without care, would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life-threatening." *Id.* 6400.03(11)(a). In Newby's case, he had a routine dental issue—it was not the result of a traumatic injury, there was no acute infection, and it was not life-threatening. *See Moskos*, 24 F.4th at 297-98 ("[m]edical care is often not immediate. Only the most fortunate are able to receive a doctor's appointment at the precise time they want it or medical attention at the very moment of arrival at a hospital. Waiting is often the name of the game. And actual treatment may not follow immediately upon medical attention . . . .").

[19] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

12

applied a similar analysis to the DFE in rejecting the *Bivens* claim. *Bulger*, 62 F.4th at 138. The Fourth Circuit held that the claim exceeded the "bounds of liability" in *Bivens* jurisprudence and "implicated 'not only the scope of [each official's] responsibilities and duties' but also the organizational policies, administrative decisions, and economic concerns inextricably tied to inmate transfer and placement determinations." *Id.* (citation omitted). *Bulger* relied on the same reasoning, in part, in finding that the DFE precluded relief on the plaintiff's FTCA claim holding that "assessing [the inmate]'s medical condition, transferring him . . . , and placing him within general population—me[t] both of the requisite prongs" of the DFE analysis. *Id.* at 143. In analyzing the first prong of the *Berkovitz-Gaubert* analysis, *Bulger* noted the "'broad directives'" in § 4042(a)(2)-(3), afforded "the BOP 'discretion regarding the implementation of those mandates,'"—the safekeeping, care, and protection of federal inmates— and that "the statute did "not dictate any particular course of action or proscribe certain conduct," which satisfied "the first prong of the discretionary function exception." *Id.* (quoting *PS*, 811 F.3d at 145). The second prong was satisfied because "'[f]actors such as available resources, proper classification of inmates, and appropriate security levels'" involved in the transfer "'are inherently grounded in social, political, and economic policy.'" *Id.* (quoting *PS*, 811 F.3d at 145).[20]

---

[20] The Fourth Circuit recently addressed the social, political, and economic policy concerns of providing federal inmates with medical care in the context of a *Bivens* claim. *Spivey v. Breckon*, 173 F.4th 174, 2026 WL 1060429 (4th Cir. 2026). The medical claims in *Spivey* concerned the adequacy of the medical treatment he received at a federal prison because of the delay in treatment. The delay resulted from the lack of a dentist at the inmate's facility, which resulted in him being placed "on the waitlist for dental care." *Id.* at *1. The Fourth Circuit found the delay "implicate[d] broader systemic issues, such as [the federal prison's] staffing levels. . . ." *Id* at *4. The Fourth Circuit added that

> importantly, these systemic concerns relate directly to the prison system's institutional management of medical care, a domain that Congress has statutorily assigned to the Executive. *See* 18 U.S.C. § 3621(i)(1) ("the Bureau of Prisons should ensure that each prisoner . . . has access to necessary medical care, mental health care, and medicine"). We have held that such claims implicating organizational policies, administrative decisions, and economic concerns "exceed the bounds of liability the Court's previous *Bivens* actions established."

13

In sum, § 4042 is a broad statute that provides the BOP with the necessary discretion to provide care for the more than 150,000 inmates in its care.[21] Although the Program Statements set up an organizational framework that provides guidance, neither § 4042 nor the Program Statements direct any specific course of action; instead they provide discretion for medical providers to exercise their professional judgment in determining who needs immediate care, and who is placed on the waitlist for treatment at a later date. Consequently, the first prong of the *Berkovitz-Gaubert* analysis is satisfied. It is also evident that providing medical services for over 150,000 inmates implicates organizational policies, administrative decisions, economic concerns, and limited resources which "'are inherently grounded in social, political, and economic policy.'" *Bulger*, 62 F.4th at 143 (quoting *PS*, 811 F.3d at 145).

Courts have also specifically found that the provision of dental care in this context falls within the DFE. *See, e.g., Harlan v. United States*, 2016 WL 7015706, at *12 (D.S.D. Dec. 1, 2016) (finding that the DFE applied and that "the court lacks subject-matter jurisdiction over Harlan's claims of improper staffing of dental services and inadequate delivery of dental care"); *Hunt v. United States*, 2014 WL 7530783, at *5 (M.D. Fla. Nov. 13, 2014) (holding that "Plaintiff's precise claim here, with respect to his removal from his initial treatment plan, is barred by the discretionary function exception"). Accordingly, for all of these reasons, Plaintiff's Complaint here falls within the DFE and, thus, within an exception to the limited waiver of sovereign immunity in the FTCA. Because the Government has not waived sovereign immunity for claims that fall within the DFE, the Court lacks subject matter jurisdiction and the Motion will be granted.

---

*Id.* (citing *Bulger*, 62 F.4th at 138). Although not an FTCA claim, *Spivey's* analysis recognizes that there are management concerns in the provision of medical care to federal inmates, which include waitlists for dental care, which are policy concerns assigned to the Executive Branch.

[21] BOP's website indicates that it currently has 153,874 inmates in its custody. *See* Federal Bureau of Prisons, https://www.bop.gov/ (About Us Tab, Statistics Tab, Population Statistics Tab; last viewed May 12, 2026).

## IV. Conclusion

For the foregoing reasons, the Defendant's Motion to Dismiss, Dkt. No. 35 is granted and this matter is dismissed for lack of jurisdiction. An appropriate order will issue alongside of this Memorandum Opinion.

Entered this _20_ day of _May_ 2026.

Alexandria, Virginia

/s/

Rossie D. Alston, Jr.
United States District Judge